hBROWN, J.,
dissenting.
I respectfully dissent. I believe that the trial court was right to deny a preliminary injunction. There was no showing of any intended commercial use of Lot 12 or of any structure having been built on the lot. All that has been shown is that defendants have used an existing servitude running the length of Lot 12 to access properties they own behind the subdivision.
Building restrictions are restraints on the use and disposition of immovable property. Accordingly, documents establishing building restrictions are subject to strict interpretation. Doubt as to the existence, validity, or extent of building restrictions must be resolved in favor of the free and unrestricted use of the immovable property. La.C.C.Code art. 783; Brier Lake, Inc. v. Jones, 97-2413 (La.04/14/98), 710 So.2d 1054.
Entrance into the Northwood Estates subdivision is from Arkansas Road onto Northwood Drive. Northwood Drive goes through the subdivision and dead-ends between Lots 15 and 27. Griggs and Sullivan own separate 56 and 17 acre tracts behind the subdivision. Griggs purchased a right-of-way from his 56-acre tract to the rear of Lot 12. This right-of-way runs through Sullivan’s 17 acres. Griggs and Sullivan bought Lot 12. They have been using an existing utility easement road on Lot 12 and the right-of-way that Griggs purchased to get to their tracts.
The restrictive covenants show that Northwood Estates subdivision was intended to be a residential community free of commercial intrusions or activities. Except for one cul-de-sac, Northwood Drive is the only street in |gthe subdivision. Northwood Drive is a public road maintained by the local governing body. The “single-family dwelling” clause in the covenants regulates only the type of structure that may be built on a particular subdivision lot, while the “residential purposes” provision restricts the use of the property in general. The word “residential” as used in the covenants is in contradistinction to “business” or “commerce.” See Concord Estates Homeowners Association, Inc., supra, (cited in the concurrence).
It appears that we have not reached a majority view in this case. Two judges write to reverse the trial court, stating that “it is clear that defendants intend to use the lot as access to multiple houses located outside the subdivision, rather than to accommodate a single-family dwelling ...” and that “the use of Lot 12 to facilitate the traffic to multiple homes would surely violate the spirit of the covenants.” (Emphasis added). The “single-family dwelling” provision refers only to the type of building that can be constructed on the subdivision lot. How the acreage outside of the subdivision is used is not relevant to the provision governing the type of structure that can be built. It is relevant, however, to the general use restriction of subdivision lots, that is, whether the lot is being used to facilitate a commercial venture, such as, the apartment complex in Beyt v. Woodvale Place Apts., supra, an oil and gas well, another subdivision or mobile home development.
The concurring judge writes that an access road can never be considered a residential purpose “regardless -of the number of houses planned for the property locat *792 ed outside of the subdivision” and that “the 1 sdesignation of all lots as ‘residential’ effectually bars the use of subdivision property for any purpose other than to construct a residence (on the lot).” (Emphasis added). Yet, the only case cited in this concurrence defines residential use “as distinguished from buildings in which people conduct business or commerce.” Concord Estates, supra, at p. 1244.
There is no requirement or obligation that lot owners actually build a single-family home. The trial court found that Mr. and Mrs. Griggs had built a home on their 56 acre tract and that Mr. and Mrs. Sullivan intend to build a home on their tract. The majority opinion refers to a third home. On rehearing, it was argued that Griggs’ son intends to build a home on his parents 56 acre tract. Defendants are not proposing to use or develop Lot 12 to facilitate any commercial purpose or venture, but only for ingress and egress to their homes.
Defendants have not built any structure on Lot 12. A plat of the subdivision was approved by the Ouachita Parish Police Jury and recorded with the clerk of court. The plat established a 20-fooL-wide servitude across Lot 12 “for service lines for electrical power, gas, water, telephone, sewer & drainage.” The testimony and briefs of both parties, however, state that the passage was created for and used only by the Greater Ouachita Waterworks to access a water well at the rear of Lot 12. A road which has existed for almost 30 years was constructed on this easement from Northwood Drive to the water well.
The majority opinion has now enjoined defendants from building any road or from any use of the easement on Lot 12. However, other residents |4of the subdivision may continue their use of this easement to access property in the rear of the subdivision. It is clear that this easement has been continuously used to access the property behind the subdivision for recreational purposes. Plaintiff, Patrick Wright, drives across Lot 12 on this existing road to get to his hunting lease which is a commercial rather than residential use. When the subdivision streets were flooded, homeowners used the utility road across Lot 12 for ingress and egress. It is incongruous that everyone may now use the easement across Lot 12 except the owners of Lot 12.
I further note that two other owners of lots in the subdivision have built passages from the street to the rear of their lots for access to lands outside of the subdivision. One of these owners does not have a residence on the lot and put up a gate because of the number of trespassers who used this road to get to the property in back of the subdivision. They each have used these passages for more than 20 years without objections.
Although the trial court did not reach the prescription issue, and the majority opinion gave it slight attention, the record supports a finding that it was well-known to homeowners in Northwood Estates that the utility easement road had been used for years to access property outside the subdivision.